Matter of Megaro (2023 NY Slip Op 01896)

Matter of Megaro

2023 NY Slip Op 01896

Decided on April 12, 2023

Appellate Division, Second Department

Per Curiam.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on April 12, 2023
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

MARK C. DILLON, J.P.
COLLEEN D. DUFFY
BETSY BARROS
FRANCESCA E. CONNOLLY
JOSEPH J. MALTESE, JJ.

2021-04541

[*1]In the Matter of Patrick Michael Megaro, an attorney and counselor-at-law. (Attorney Registration No. 4094983)

The respondent was admitted to the Bar in the State of New York at a term of the Appellate Division of the Supreme Court in the Second Judicial Department on January 22, 2003. By order to show cause dated July 22, 2021, this Court directed the respondent to show cause why an order should not be made and entered pursuant to 22 NYCRR 1240.13 imposing discipline upon him for the misconduct underlying the discipline imposed by an order of discipline of the Disciplinary Hearing Commission of the North Carolina State Bar dated April 27, 2021.

Catherine A. Sheridan, Hauppauge, NY (Nancy B. Gabriel of counsel), for Grievance Committee for the Tenth Judicial District.
Patrick Michael Megaro, Orlando, Florida, respondent pro se.

PER CURIAM.

OPINION & ORDER
By order dated April 27, 2021, the Disciplinary Hearing Commission of the North Carolina State Bar (hereinafter the DHC) imposed a five-year suspension on the respondent from the practice of law for his violation, some with multiple counts, of North Carolina Rules of Professional Conduct (hereinafter NC RPC) rules 1.1 (competence), 1.3 (diligence), 1.5(a) (illegal/excessive fee or expenses), 1.7 (conflict of interest), 1.8(a) (business transaction with clients), 1.8(e) (financial assistance to clients), 1.15-2 (misuse of entrusted funds), 1.15-2(a) (proper maintenance and disbursement of fiduciary funds), 1.15-2(g) (failure to withdraw funds the respondent was entitled to from the escrow account), 3.3(a) (false statement to a tribunal), 8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation), and 8.4(d) (conduct prejudicial to the administration of justice).
The North Carolina Proceeding
The respondent was admitted to the North Carolina State Bar (hereinafter the NCSB) in 2013. The underlying misconduct took place from February 2015 through August 2017 when the respondent engaged in the practice of law in North Carolina but maintained his office in Florida.
On October 11, 2019, the NCSB filed an amended complaint against the respondent containing 19 charges alleging violations of multiple NC RPC stemming from his representation of two diminished capacity criminal defendants who were exonerated, and one charge concerning his failure to act with reasonable diligence and promptness in an unrelated appellate matter. A five-day hearing took place from March 15 to 19, 2021, before the DHC wherein the respondent was represented by counsel, F. Lane Williamson. On April 27, 2021, the DHC issued a 24-page order of discipline, finding that, based on "the record proper, the stipulations of the parties, the testimony and exhibits admitted at the hearing, and upon making credibility determinations of the witnesses [*2]who testified at the hearing," the NCSB established by "clear, cogent, and convincing evidence" that the respondent violated 11 charges and dismissing the rest.
The DHC Order of Discipline
In the April 27, 2021 order of discipline, the DHC found the following facts: In 1983, brothers Henry McCollum and Leon Brown were wrongfully convicted of the rape and murder of Sabrina Buie, an 11-year-old girl, and sentenced to death. On appeal, McCollum and Brown were granted new trials by the Supreme Court of North Carolina. McCollum was retried, convicted again of the first-degree rape and first-degree murder of Buie, and was sentenced to death on the murder charge. In the penalty phase of McCollum's retrial, the jury found as mitigating circumstances that he was mentally disabled, that the offense was committed while he was under the influence of mental or emotional disturbance, that he was easily influenced by others, and that he had difficulty thinking clearly under stress. Brown was retried, convicted of first-degree rape, and sentenced to life in prison. Brown appealed the conviction, and in an opinion denying the appeal, the court noted the evidence of Brown's subaverage intelligence with an IQ in the range of 49 to 65 and limited ability to read and write.
On April 3, 1995, McCollum filed a motion for appropriate relief (hereinafter MAR) and was represented by Kenneth Rose, an attorney with the Center for Death Penalty Litigation (hereinafter the CDPL), a nonprofit organization, and attorneys from the law firm WilmerHale. The MAR alleged, inter alia, that McCollum's incriminating statement was unreliable due to his intellectual disabilities, evidenced by reports from four mental health professionals concluding that McCollum was mentally disabled with various diagnoses, including neuropsychologically and cognitively impaired, having the intellectual functioning level of a child in elementary school, highly suggestible and subject to the influence of others, and generally not capable of understanding and weighing the consequences of his choices. In January 2002, Rose filed an amended MAR for McCollum and submitted additional evidence of McCollum's mental and cognitive disabilities.
On August 26, 2014, Rose filed a MAR claiming that McCollum was innocent based on DNA evidence found at the crime scene. The DNA belonged to Rosco Artis, an inmate serving a life sentence for the murder of another woman in the same area as Buie that was committed one month after Buie's murder. Brown filed a similar MAR through separate counsel.
On September 2, 2014, the Superior Court of North Carolina granted McCollum's and Brown's MARs and vacated their convictions and judgments with no opposition from the Robeson County District Attorney's Office. McCollum and Brown were released from prison after serving 31 years for crimes they did not commit.
After McCollum's and Brown's release from prison, on September 11, 2014, the CDPL filed petitions for pardons of innocence with Governor Pat McCrory and sought compensation for their wrongful convictions from the North Carolina Industrial Commission (hereinafter the Industrial Commission). The statutorily mandated amount for compensation was $750,000 each, and the attorneys represented McCollum and Brown on a pro bono basis.
On September 15, 2014, Governor McCrory's Clemency Administrator sent a letter to the CDPL notifying it that "[a]ll necessary documents [had] been received" and that it would be notified once a decision was made. On September 23, 2014, the Robeson County District Attorney sent Governor McCrory a letter urging him to grant McCollum and Brown pardons of innocence.
Rose had known McCollum for more than 20 years, knew the degree of McCollum's mental and emotional suffering while on death row, knew of McCollum's long-standing history of intellectual disabilities, and was personally concerned for McCollum's welfare after his release due to, among other issues, McCollum's vulnerability and suggestibility. With the assistance of the CDPL, McCollum and Brown began receiving charitable donations and financial assistance from various sources once they were released from prison, and their situation caught the attention of the media.
In September 2014, attorneys Mike Lewis, Mark Rabil, and Tom Howlett agreed to represent McCollum and Brown on a contingency fee basis in civil litigation arising from the alleged misconduct of law enforcement officers and their agencies involved in the investigation and prosecution of McCollum and Brown.
In January 2015, Kim Weekes and Deborah Pointer, who were not attorneys and referred to themselves as "consultant advisors," contacted Geraldine Brown Ransom (hereinafter Geraldine) and claimed that they could help McCollum and Brown. Geraldine was Brown's sister, but not a guardian for either McCollum or Brown at that point. Weekes and Pointer entered into an [*3]agreement with Geraldine to serve McCollum and Brown as their "activist/advocate consultants" and to assist with "the pardon process." On February 2, 2015, Weekes and Pointer sent a letter to Rose notifying Rose that Weekes and Pointer were authorized to represent McCollum and Brown "in all and any of the Civil/Litigation of the Pardon/Fundraising of NC matters."
In late February 2015, Weekes and Pointer contacted the respondent about representing McCollum and Brown. Thereafter, the respondent read news accounts of McCollum's and Brown's cases, reviewed transcripts of their MAR hearings, and did preliminary research on their cases.
The DHC found that with minimal research on the cases of McCollum and Brown, the respondent would have learned of their significant intellectual disabilities. Moreover, a review of the MAR transcripts would have revealed that McCollum and Brown had low IQs and were unable to understand the confessions they were coerced into signing. Sharon Stellato, a staff member of the North Carolina Actual Innocence Commission, testified in extensive detail at the September 2, 2014 MAR hearing that both McCollum and Brown had been diagnosed as mentally disabled with IQs in the 50s.
On February 28, 2015, before the respondent was scheduled to meet with McCollum and Brown, Pointer stated to the respondent, "Please make sure you do not discuss monetary amounts in front of the brothers as per their sister. [McCollum] believes he understands monetary things which he does not. He has a local girlfriend now and is promising her all kinds of things. Geraldine will give her brothers a monthly stipend. In fact [Weekes] and I are recommending a monthly stipend to the family after we have them moved, settled, etc. from cash advance. Let's talk before you meet tmw."
On or about March 1, 2015, with knowledge that McCollum and Brown had been consistently diagnosed as mentally disabled and were unable to understand their confessions, the respondent entered into a retainer agreement with them and with Geraldine, who purportedly informed the respondent that she had power of attorney to act for McCollum and Brown to handle their civil claims against Robeson County, Red Springs Police Department, and the State of North Carolina. Geraldine signed the retainer agreement as attorney-in-fact. No power of attorney was introduced as an exhibit at the disciplinary proceeding.
At the time that McCollum and Brown executed the retainer agreement, the respondent knew petitions for pardons had already been filed on their behalf. The respondent's retainer agreement with McCollum and Brown stated, inter alia, that the respondent would collect a contingency fee of between 27% to 33% of any monetary recovery or award in connection with their claims against Robeson County, the Red Springs Police Department, and the State of North Carolina; that McCollum and Brown were "conveying an irrevocable interest in the net proceeds arising" from any recovery to the respondent; that if McCollum and Brown elected "to terminate th[e] agreement, it would not terminate [the respondent's] contingency interest in the outcome of" the case; and that "under no circumstances [would [the respondent's] firm be] required to relinquish any part of the contingency fee provided [t]herein in order to" accommodate new counsel. The DHC found that this retainer agreement created an impermissible nonrefundable fee retainer.
On March 2, 2015, the respondent gave $1,000 cash to McCollum and Brown. On the same day, the respondent began working with Multi Funding, Inc. (hereinafter MFI), to obtain loans for McCollum and Brown. On that date, the respondent told representatives of MFI, "This case reads almost like the script to The Green Mile. [McCollum] and [Brown] moved to Red Springs, NC from NJ with their mother and sister. Both have IQs in the 50s/60s."
On March 4, 2015, the respondent facilitated for McCollum and Brown to each receive a loan from MFI for $100,000 at 19% interest, compounded every 6 months. The respondent signed the loan documents wherein he agreed to pay MFI before paying his clients, and signed a document entitled "Attorney Acknowledgement of Explanation of Terms to Plaintiff, Of Irrevocable Lien and Assignment to Multi Funding, Inc.," claiming that he had explained the terms of the loan agreements to McCollum and Brown. Neither McCollum nor Brown would have received the loans if the respondent did not sign the attorney acknowledgement.
In March 2015, the respondent ensured that Weekes and Pointer were paid $10,000 from these initial loan proceeds to McCollum and Brown. On March 16, 2015, the respondent sent letters to Rose and Howlett, warning them to never contact McCollum and Brown again as it would violate the "rules of ethics" and would be "actionable as tortious interference of contract."
On June 4, 2015, following media efforts directed by the respondent, Governor [*4]McCrory granted pardons of innocence to McCollum and Brown. On July 10, 2015, the respondent filed a joint petition with the Industrial Commission seeking compensation for McCollum and Brown, and stated in the petition that "[a]t all times hereinafter mentioned, both men had and still have limited mental abilities. Mr. McCollum's Intelligence Quotient (IQ) has been scored at 56, while Leon Brown's IQ has been scored at 54. Both of these IQ scores are within the intellectually disabled range."
The DHC found that the respondent performed minimal work on behalf of McCollum and Brown in the Industrial Commission proceeding, and the attachments to the petitions were almost exclusively the work product and documents provided by the CDPL.
In August 2015, the respondent commenced an action in the United States District Court for the Eastern District of North Carolina (hereinafter the EDNC) on behalf of McCollum and Brown against various parties alleged to be responsible for their wrongful convictions and incarceration.
Also in August 2015, Brown, who suffers from bipolar disorder and schizophrenia, had a breakdown and was hospitalized. He was placed in a group home some months later. As a result of Brown's breakdown, on August 17, 2015, the respondent filed a petition to have Brown declared incompetent. In this petition, the respondent highlighted his own experience and training on how to recognize clients with mental health issues and noted that Brown's medical records from the Department of Correction showed a clear progression of mental illness, starting in 1984 and continuing in severity until his release. The respondent also asserted that Brown lacked the basic life skills necessary to take care of himself and relied on his family and others for all his basic needs since his release from prison. Upon his release from prison, Brown abruptly stopped taking medication, and had to be admitted to mental health facilities because of his inability to make rational decisions about his medical care. The respondent further stated in Brown's incompetency petition that both brothers were unable to understand the concept of paying utility bills and making purchases: "One thing is clear: neither Leon Brown nor Henry McCollum have a concept of budgeting or spending limits, nor do they have any experience of budgeting money, let alone large sums of money."
The respondent then proposed for Geraldine to be appointed as Brown's guardian, despite her lack of expertise or knowledge of how to serve as a guardian, and despite being in need of money herself.
The DHC found that given the pardons of innocence, there was no dispute that McCollum and Brown were entitled to the statutory maximum Industrial Commission award of $750,000 each. Therefore, a contingent fee for representation before the Industrial Commission was not justified because there was no risk that McCollum and Brown would not recover the maximum, and the respondent was entitled only to reasonable compensation for the minimal services rendered in connection to the Industrial Commission proceeding.
In October 2015, the respondent received $1.5 million from the Industrial Commission on behalf of McCollum and Brown, from which the respondent took a one-third fee totaling $500,000. The respondent then used approximately $110,000 each from McCollum and Brown to repay the loans that the respondent facilitated from MFI, even though it was questionable whether the loans were enforceable due to McCollum's and Brown's incapacity to enter into the loan contracts. The respondent also charged McCollum and Brown a combined total of $21,173.88 in costs and expenses, which included costs related to the pardon process and Brown's incompetency proceeding. The respondent then took $25,972.14 to repay himself and his firm for money advances to McCollum and to Brown, some of which were for living expenses and not for the costs of the litigation.
On October 21, 2015, the respondent disbursed $358,363.28 to McCollum. Had McCollum let the CDPL and Howlett handle the Industrial Commission proceeding, McCollum would have received $750,000.
By May 11, 2016, seven months after the respondent disbursed $358,363.28 to McCollum, McCollum had spent all of the funds. The respondent then facilitated another loan for McCollum from MFI for $50,000 at 18% interest, compounded every 6 months, with the same above mentioned forms.
On or about July 28, 2016, the respondent received a report from Thomas Harbin, a neuropsychologist hired by the respondent to assess McCollum's psychological and behavioral functioning to assist in McCollum's civil cases. In his report, Harbin found that McCollum suffered [*5]from post-traumatic stress disorder, suffered from intellectual disabilities, was unable to make many everyday decisions, and had a profile suggesting that he would be overly dependent upon others for decision-making, lacked self-confidence and assertiveness, and would be easily influenced and manipulated by others.
On October 27, 2016, the respondent facilitated another loan from MFI for McCollum for $15,000 at 18% interest, compounded every 6 months. The loan contracts provided that if McCollum were to retain new counsel and failed to cause the new counsel to execute a lien on any recovery in favor of the lender, McCollum would be subject to a lawsuit from the lender for damages, costs, and attorneys' fees.
In February 2016, Geraldine was removed as guardian for mismanaging Brown's funds. Months after Geraldine had informed the respondent of her removal, the respondent helped Geraldine get a $25,000 loan from MFI purportedly for Brown's rent. The loan asserted a lien against any future recovery made by Brown with the loan proceeds sent to Geraldine.
In December 2016, a mediation was conducted in McCollum and Brown's case against the Town of Red Springs, where the respondent gave a presentation detailing the subaverage intellectual functioning and significant limitations in adaptive functioning of McCollum and Brown.
On February 1, 2017, Derrick Hamilton, a friend and occasional videographer for the respondent, wired $30,000 into the respondent's trust account. Twenty thousand dollars of the $30,000 wire transfer was for McCollum's benefit, and the remaining $10,000 was a loan to the respondent, which he kept in his trust account. The DHC found that by not promptly disbursing the $10,000 loan from Hamilton from the trust account, the respondent commingled his funds with entrusted client funds.
In settlement discussions with the Town of Red Springs, the competence of McCollum to agree to a settlement was raised by opposing counsel. In anticipation of submitting a settlement proposal for court approval, the respondent retained Harbin again to evaluate McCollum's competency to enter into a settlement agreement. Harbin conducted a second evaluation of McCollum and produced a report on or about March 8, 2017, finding that, contrary to his previous report, McCollum was able to manage his own financial and legal affairs, and to make or communicate important decisions concerning his person and finances. In April 2017, the respondent submitted to the EDNC a proposed settlement for McCollum and Brown's civil suit against the Town for $500,000 each. The respondent asked the court to approve the settlement and his 33% fee, claiming that his clients were competent to enter into the retainer agreement and the settlement agreement, and that the settlement was appropriate because both McCollum and Brown's new guardian had agreed to it. J. Duane Gillian, an attorney who was the guardian of the estate for Brown, had approved the proposed settlement.
In his pleading to the EDNC, the respondent claimed that he had done the following work for McCollum and Brown in the civil suit and that the following actions, among others, led to approximately $70,000 in costs and justified his requested $330,000 fee: "counsel represented both Plaintiffs in their successful petitions to the Governor of North Carolina for Pardons of Innocence, which included several meetings with Governor Pat McCrory and/or his staff, submission of documents and information to the Governor's Office, and several meetings with Plaintiffs; (ii) counsel represented both Plaintiffs in their successful petitions for statutory compensation for wrongful imprisonment pursuant to North Carolina General Statutes § 148-82 et seq. in the North Carolina Industrial Commission, which included preparation of the petition, appearance in the Commission, and presentation of evidence at the hearing; (iii) counsel petitioned the Cumberland County Superior Court for a guardian for Leon Brown and appeared in that court at a hearing and presented evidence[.]"
The respondent, however, had already compensated himself for these services with funds from the Industrial Commission awards to McCollum and Brown. The DHC found that the respondent's statement to the EDNC requesting additional compensation to be a material misrepresentation. The proposed settlement agreement submitted by the respondent would have left McCollum with $178,035.58 while the respondent would have received $403,493.96 from the settlement.
On May 5, 2017, United States District Court Judge Terrance Boyle held a hearing concerning the proposed settlement and raised concerns about the competency of McCollum and Brown to enter into the settlement agreement and about the respondent's conflict of interest by entering into retainer agreements with clients who were incompetent. Judge Boyle also rejected [*6]Harbin's evaluation as unpersuasive. On or about May 10, 2017, Judge Boyle appointed Raleigh attorney Raymond Tarlton as guardian ad litem (hereinafter GAL) for McCollum.
On July 26, 2017, Tarlton moved to determine the validity of the retainer agreement between McCollum and the respondent based on McCollum's incapacity. A hearing was held on August 10, 2017, by Judge Boyle wherein the respondent presented evidence and argued that McCollum was competent, despite several previous submissions to the court to the contrary, and despite McCollum's notable lack of mental capacity being an important part of McCollum's case against Robeson County, the Red Springs Police Department, and the State of North Carolina. McCollum's claims of incompetency could also invalidate the contracts he signed with Pointer, Weekes, and MFI. After the hearing, Judge Boyle asked the parties to submit recommendations of mental health experts to conduct a competency evaluation of McCollum. When the respondent notified Harbin that Tarlton had nominated George Corvin, a forensic psychiatrist, to conduct an evaluation of McCollum, Harbin sent an email to the respondent stating, "Patrick, I don't mean to tell you your business and you may have already thought of this, but I would recommend that you have some rehearsal with [McCollum] and make sure he knows where his bank accounts are, how much is in them, how to write a check, what his income and bills are, etc." In response, the respondent wrote, "Point well taken, thank you."
On August 15, 2017, the respondent moved to discharge Tarlton as GAL and for a declaration that no further evaluation of McCollum's competency was required. On August 16, 2017, Judge Boyle entered an order directing Corvin to evaluate McCollum's competency. Based on Corvin's evaluation, on October 23, 2017, Judge Boyle entered an order finding that McCollum was not competent to manage his own affairs and that the respondent's retainer agreement with McCollum was invalid due to McCollum's incompetency. In the order, Judge Boyle found that the respondent "was plainly on notice that his potential clients had intellectual disabilities and that their abilities to proceed without a guardian were at issue. Nonetheless, [the respondent] entered into a representation agreement and has, to the [c]ourt's knowledge, never sought to have the agreement ratified by any duly appointed guardian for either plaintiff. Accordingly, the [c]ourt finds that, based on McCollum's incompetence, the representation agreement between [the respondent] and McCollum is invalid."
On December 14, 2017, the EDNC approved the settlement with the Town of Red Springs, but denied the respondent's request for fees. The court allowed the respondent to remain as counsel of record in the interim and held in abeyance the issue of the fees for a later determination. On April 13, 2018, Tarlton terminated the respondent's representation of McCollum, which was challenged by the respondent's law partner. On May 18, 2018, the court directed the removal of the respondent from the case "for good cause shown."
The DHC concluded that at the time the retainer agreement, the loans, and the proposed settlement agreement with the Town of Red Springs were entered into, the respondent knew that McCollum and Brown did not have the capacity to enter into the agreements or loans.
At the hearing, the respondent admitted to "technical trust account violations" and having "inaccurate language" in his retainer agreement but denied all other charges. The DHC concluded in the order of discipline that:
"a. By claiming an irrevocable interest in McCollum and Brown's potential financial payments from the state, [the respondent] charged an improper fee in violation of Rule 1.5(a) and engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c);
"b. By entering into a representation agreement with his clients when he knew they did not have the capacity to understand the agreement, [the respondent] engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c) and engaged in conduct prejudicial to the administration of justice in violation of Rule 8.4(d);
"c. By having McCollum sign off on a settlement agreement and representing to a court that McCollum had consented to the settlement when [the respondent] knew McCollum did not have the capacity to understand the agreement, [the respondent] made a false statement to a tribunal and engaged in conduct involving dishonesty, fraud, deceit or misrepresentation that was prejudicial to the administration of justice in violation of Rule 3.3(a), Rule 8.4(c), and Rule 8.4(d);
"d. By charging and collecting one-third of McCollum and Brown's Industrial Commission award when his role in that process was minimal and pro forma, [the respondent] charged and collected an [*7]excessive fee in violation of Rule 1.5(a);
"e. By misrepresenting to the United States District Court in his proposed settlement of the Civil Suit that some of his work and costs in that action were for actions for which he had already been paid by McCollum and Brown's Industrial Commission award, [the respondent] made a false statement to a tribunal and engaged in conduct involving dishonesty, fraud, deceit or misrepresentation that was prejudicial to the administration of justice in violation of Rule 3.3(a), Rule 8.4(c), and Rule 8.4(d);
"f. By signing various Attorney Acknowledgements of Explanation of Terms to Plaintiff, Of Irrevocable Lien and Assignment to Multi Funding, Inc., claiming to Multi Funding, Inc. that he had explained the terms of the loan agreements to McCollum and Brown when they were not competent to understand those terms or enter into those agreements, [the respondent] made a material misrepresentation to Multi Funding, Inc. and thereby engaged in conduct involving dishonesty, fraud, deceit or misrepresentation in violation of Rule 8.4(c);
"g. By lending McCollum and Brown money, both directly and/or through Derrick Hamilton, [the respondent] entered into a business transaction with his clients in violation of Rule 1.8(a) and Rule 1.8(e);
"h. By helping Geraldine get a $25,000.00 loan from Multi Funding, Inc. against any future recovery made by Brown, with the loan proceeds sent directly to Geraldine for Brown's rent when Geraldine was not Brown's guardian, [the respondent] misused entrusted funds in violation of Rule 1.15-2 and failed to represent Brown with competence or diligence in violation of Rule 1.1 and Rule 1.3;
"i. By not promptly disbursing from his trust account $10,000.00 to which he was entitled as proceeds of a loan from Derrick Hamilton, [the respondent] failed to properly maintain and disburse fiduciary funds in violation of Rule 1.15-2(a) and failed to withdraw the amounts to which Defendant was entitled in violation of Rule 1.15-2(g);
"j. By advancing money to McCollum and Brown for living expenses, and by guaranteeing repayment of various loans for McCollum and Brown, [the respondent] provided financial assistance to clients in connection with pending litigation in violation of Rule 1.8(e); and
"k. By entering into a retainer agreement with McCollum that was invalid due to McCollum's lack of competency and then arguing that McCollum was competent in an effort to protect his fee despite such arguments potentially harming McCollum's then-current claims against Robeson County, the Red Springs Police Department, and the State of North Carolina, [the respondent] engaged in a conflict of interest, as [the respondent's] representation of McCollum was materially limited by [the respondent's] personal interest in defending his fee, in violation of Rule 1.7."
In aggravation, the DHC found that in 2015, the respondent was reprimanded by the NCSB's Grievance Committee for assisting in the unauthorized practice of law and making misleading statements about his legal services. In mitigation, the respondent submitted character evidence from former clients and friends who believed that the respondent was a person of honesty, integrity, and good character.
Nevertheless, the DHC concluded that the respondent's misconduct caused significant harm to the profession because it reinforced the negative stereotype that attorneys are "greedy, selfish, and dishonest." While the respondent cooperated during the disciplinary proceeding, the DHC found that the respondent had a "pervasive tendency to blame others for his misconduct rather than acknowledging wrongdoing." Specifically, the respondent blamed McCollum's and Brown's previous attorneys for the allegations of misconduct rather than his own misconduct. The DHC found that the respondent "ha[d] not expressed remorse or shown any insight regarding the ways in which he betrayed his clients' trust."
Based on the above findings, the DHC suspended the respondent from the practice of law for a period five years, with the administrative fees and costs of the disciplinary proceeding, including the deposition and expert witness costs, charged to the respondent. After three years of suspension, the respondent would be eligible to apply for a stay of the remaining period of suspension if he complied with certain conditions, including: (1) that the respondent pay the costs [*8]and fees of the disciplinary proceeding within 30 days of service upon him of the bill; (2) that the respondent reimburse his clients $250,000 for the excessive fee he collected; (3) that the respondent complete 10 hours of continuing legal education (hereinafter CLE) on the topic of ethics and professionalism in addition to the general CLE requirements for reinstatement; and (4) that the respondent arrange with an active member of the NCSB in good standing to serve as a monitor. The monitor must agree to meet monthly with the respondent in person for a period of two years, provide supervision to ensure that the respondent timely and completely handles client matters, and provide quarterly reports of the supervision. The respondent is responsible for any costs charged by the monitor for this supervision. Furthermore, as a condition of seeking a stay, during the period of suspension, the respondent was required to refrain from violating the rules of professional conduct of any jurisdiction in which he is licensed or the laws of the United States, or any state or local government, other than minor traffic violations. If the respondent's petition for a stay is granted after three years of suspension, he must cooperate with the monitor as described above for a period of two years following the stay of the suspension and continue to refrain from violating any rules of professional conduct and laws. Otherwise, the stay of suspension may be lifted.
New York Proceeding
By order to show cause dated July 22, 2021, the respondent was directed to show cause on or before September 13, 2021, why an order should not be made and entered pursuant to 22 NYCRR 1240.13 imposing discipline upon him for the misconduct underlying the discipline imposed by the DHC order of discipline. The order to show cause further directed that if the respondent asserted any of the defenses provided in 22 NYCRR 1240.13(b)(1) or (2), his "affidavit shall be supported by a copy of the record of the proceedings held in the State of North Carolina."
By letter dated August 30, 2021, the respondent requested a 90-day adjournment, which was granted. On or about December 2, 2021, the respondent was granted a further extension until February 14, 2022. On February 8, 2022, the respondent requested another 60-day adjournment, which was denied and he was instructed to respond to the order to show cause by February 14, 2022.
On February 14, 2022, the respondent submitted a 56-page affidavit, mostly challenging the findings by the DHC and asserting all three defenses under 22 NYCRR 1240.13(b). In his affidavit, the respondent indicates that because he is asserting the defenses pursuant to 22 NYCRR 1240.13(b), he is "sending a copy of the entirety of the record from the North Carolina Disciplinary Hearing Commission . . . as well as a copy of [his] file in the underlying matter," and he estimates his submission is approximately 500,000 pages. The copy of the respondent's file he submitted includes drafts of his North Carolina court submissions and proposed court exhibits. The respondent requests a hearing pursuant to 22 NYCRR 1240.8(b)(1) to litigate his contentions in his affidavit and to provide live testimony for mitigation. 22 NYCRR 1240.8(b)(1) entitles the respondent to a hearing only for "formal disciplinary proceedings" where the Grievance Committee files a petition of charges. Under 22 NYCRR 1240.13, governing reciprocal disciplinary proceedings, the respondent is not entitled to a hearing.
In the respondent's affidavit, he asserts different versions of facts than those found by the DHC, which is improper as he cannot challenge here the findings by the DHC order of discipline (see Matter of Harrison, 187 AD3d 37, 41; Matter of Weissmann, 180 AD3d 155, 158).
Regarding his defenses, the respondent first argues that there is an infirmity of proof
and that this Court cannot put any faith and credit to the DHC order of discipline sustaining charges against him. For the first charge, where he was found to have claimed an irrevocable interest in the potential financial payment to McCollum and Brown, the respondent argued that "[t]here was no evidence presented with respect to the language of the retainer. . . except [his] testimony, corroborated by contemporaneous emails and other lawyers' testimony, that it was never [his] intention to assert a charging lien and inhibit the clients' ability to discharge [him]. The only evidence in support of this charge is conjecture and opinion as to [his] true intentions. This is grossly insufficient." If the respondent is challenging the DHC's plain reading of his retainer agreement, which "convey[s] an irrevocable interest in the net proceeds arising from any recovery to [the respondent]," as "conjecture and opinion," he must address this in North Carolina, not in this proceeding.
The respondent also challenges all of the DHC's findings that were premised on his clients being incompetent because "[t]here was no evidence . . . that it should have been blatantly obvious to [him] that McCollum and Brown were unable to enter into an agreement to retain counsel [*9]or take out loans" and they were not declared incompetent when he began their representations. The respondent further argues that just because his clients have low IQs, it does not mean that they were not competent enough to enter into a retainer agreement with him and essentially understand the financial structure he had laid out for his fees. Again, if the respondent is arguing that the DHC erred in finding that he should have known that his clients were incompetent and could not appreciate financial transactions, despite the respondent making similar assertions in various filings with the courts in North Carolina, such matter is more properly addressed in North Carolina and not this reciprocal disciplinary proceeding.
With regard to the defense that the respondent's misconduct in North Carolina does not constitute misconduct in New York, we disagree, as many of the NC RPC the respondent violated, as found by the DHC, have a counterpart under the same section under the New York Rules of Professional Conduct (22 NYCRR 1200.0).
We find the respondent's remaining asserted defenses that, inter alia, he was denied due process in North Carolina because he was not a local attorney unlike the others involved in the McCollum/Brown proceedings, and thus there was a disparate treatment of him, and that he was not afforded a "real meaningful opportunity to be heard on the contents of the Order of Discipline" (emphasis added) are without merit.
Findings and Conclusion
Accordingly, we find that the imposition of reciprocal discipline is warranted based on the findings of the DHC.
Regarding the sanction, this Court has found that:
"[i]n reciprocal proceedings, we generally accord significant weight to the sanction imposed by the jurisdiction where the misconduct occurred because the foreign jurisdiction has the greatest interest in fashioning sanctions for misconduct perpetrated therein. Therefore, when the sanction prescribed by the foreign jurisdiction is not inconsistent with the sanction for similar misconduct in this jurisdiction, the Court should impose the same sanction" (Matter of Sirkin, 77 AD3d 320, 323 [citations omitted]; see Matter of Esposito, 126 AD3d 93, 109).
"However, when the sanction in the [foreign jurisdiction] deviates substantially from this Court's precedent, we have departed from the general policy of deference and imposed a more severe penalty where warranted" (Matter of Munroe, 89 AD3d 1, 7; see Matter of Esposito, 126 AD3d at 109).
The DHC found in the order of discipline that:
"[The respondent's] course of misconduct involving the manipulation and exploitation of vulnerable clients reflects that [the respondent] is either unwilling or unable to conform his behavior to the requirements of the Rules of Professional Conduct. [The respondent] has refused to acknowledge the wrongfulness of his conduct and there is no evidence suggesting that he intends to modify his behavior. Accordingly, if [the respondent] were permitted to continue practicing law, he would pose a significant and unacceptable risk of continued harm to clients, the profession, the public, and the administration of justice."
Under the totality of the circumstances, including the character evidence submitted, we find that a disbarment is warranted.
DILLON, J.P., DUFFY, BARROS, CONNOLLY and MALTESE, JJ., concur.
ORDERED that pursuant to 22 NYCRR 1240.13, the respondent, Patrick Michael Megaro, is disbarred, effective immediately, and his name is stricken from the roll of attorneys and counselors-at-law; and it is further,
ORDERED that the respondent, Patrick Michael Megaro, shall comply with the rules governing the conduct of disbarred or suspended attorneys (see id. § 1240.15); and it is further,
ORDERED that pursuant to Judiciary Law § 90, effective immediately, the respondent, Patrick Michael Megaro, shall desist and refrain from (1) practicing law in any form, either as principal or as agent, clerk, or employee of another, (2) appearing as an attorney or counselor-at-law before any court, Judge, Justice, board, commission, or other public authority, (3) giving to another an opinion as to the law or its application or any advice in relation thereto, and (4) holding himself out in any way as an attorney and counselor-at-law; and it is further,
ORDERED that if the respondent, Patrick Michael Megaro, has been issued a secure pass by the Office of Court Administration, it shall be returned forthwith to the issuing agency, and the respondent shall certify to the same in his affidavit of compliance pursuant to 22 NYCRR 1240.15(f).
ENTER:
Maria T. Fasulo
Clerk of the Court